J-S11017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.S.B., A MINOR | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.G., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1629 WDA 2025 |

Appeal from the Order Entered November 12, 2025
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s): 2025-218 O.C.

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.:                    **FILED: May 29, 2026**

D.G. ("Father") appeals from the order entered on November 12, 2025, in the Court of Common Pleas of Clarion County Orphans' Court, which involuntarily terminated his parental rights to L.S.B. ("Child").[1, 2]  After careful review, we affirm.

## Background

We glean the following relevant facts and procedural history from the certified record.  Mother and Father are the biological parents of two young

---

[1] J.B.'s ("Mother") parental rights to Child were also terminated on the same date.  Mother filed a separate appeal with this Court, which is addressed in a separate memorandum at No. 1630 WDA 2025.

[2] A guardian *ad litem* ("GAL"), Zach Shekell, Esquire, and a child advocate, LaVieta Lerch, Esquire, were appointed to represent the best interests and the legal interests of Child.  Order, 9/10/25 (single page).  Both attorneys participated in the termination hearing.

sons, Child (born September 2020) and R.B. (born January 2024).[3, 4] **See** Petition for Involuntary Termination of Father's Parental Rights ("Petition"), 9/5/25, at ¶¶ 2-3; N.T. at 6-7. The parties do not live together and have never been married. Petition at ¶¶ 3-4. Father has never had primary physical custody of Child. N.T. at 34, 125.

Briefly, Child was initially adjudicated dependent on February 1, 2024, due to Mother and Father's drug use and housing instability, and was placed into foster care. Petition at ¶ 8. That dependency was terminated on January 10, 2025, at which time Child was returned to Mother's care. **Id.** However, four days later, on January 14, 2025, Child was again removed from Mother's custody after being found outside, unattended, and improperly attired in the middle of the night. **Id.** Both parents tested positive for illegal substances at the time. **Id.** On January 24, 2025, Child was adjudicated dependent for a second time and returned to foster care. **Id.** at ¶ 5; **see also id.** at ¶ 6 (indicating Child was removed from Mother's care due to Mother's drug use,

---

[3] Clarion County Children & Youth Services ("CYS") received a referral regarding Mother's testing positive for methamphetamines and THC the day after the birth of R.B. **See** N.T., 11/10/25, at 6. R.B. was immediately removed from Mother's care and adjudicated dependent on February 1, 2024. **Id.** at 8. On November 10, 2025, Mother voluntarily relinquished her parental rights to R.B., and Father's parental rights to R.B. were involuntarily terminated. **See id.** at 135-40, 142. Father did not appeal the termination of his parental rights as to R.B.

[4] Father also has three older children who have been adjudicated dependent. N.T. at 123.

periods of incarceration, and lack of stable housing; Father was unable to provide stable care for Child at the time).

On September 5, 2025, CYS filed a petition seeking the involuntary termination of Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. In its petition, CYS indicated Child had been in foster care for 15 of the past 22 months. Petition at ¶ 8. It further averred Father had taken no steps to address his reunification goals and, thus, the circumstances which resulted in Child's removal had not been remedied. *Id.*

A termination hearing was held on November 10, 2025, at which CYS presented the testimony of several caseworkers, and Father testified on his own behalf. We summarize the testimony of the parties' witnesses, in pertinent part, as follows:

*Erin Schrecengost*

Erin Schrecengost — the initial CYS caseworker assigned to the family — indicated the agency received its first referral regarding Child in January of 2024. N.T. at 7. Ms. Schrecengost conveyed, prior to that referral, Mother had left Child in the care of her sister ("Maternal Aunt") because Mother did not have stable housing. *Id.* After a year of caring for Child, Maternal Aunt reached out to CYS requesting Child be removed from her home, as she could no longer care for him. *Id.* Ms. Schrecengost stated Child was then removed from the home and placed into foster care on January 29, 2024. *Id.* She testified Father was not an appropriate placement option at that time. *Id.* at

8; *see also id.* (noting Father had other children adjudicated dependent at the time due to housing and drug and alcohol concerns, and "he had not done anything … to work on his goals for those children").

Ms. Schrecengost recalled reunification goals were put in place for both Mother and Father following Child's initial dependency adjudication on February 1, 2024. *Id.* Those goals included maintaining a sober lifestyle, stabilizing their mental health, and improving their positive parenting skills. *Id.* at 9-11. Ms. Schrecengost reported Father attended visitation, "but otherwise … was not maintaining his sobriety or meeting his other goals." *Id.* at 9. For instance, she explained Father attended an inpatient drug and alcohol program from April 4 to May 2, 2024. *Id.* Upon his release, he began to participate in outpatient drug and alcohol treatment at CenClear; however, he was "unsuccessfully discharged" from that program only a few weeks later, on May 23, 2024. *Id.* at 10. He did not resume any further drug and alcohol treatment at that time, nor did he participate in any mental health treatment. *Id.* at 10-11. Finally, she observed that while Father participated briefly in Nurturing Parenting, he did not successfully complete the program. *Id.* at 11-12.

According to Ms. Schrecengost, Mother, on the other hand, made sufficient progress on her reunification goals and obtained appropriate housing. *Id.* at 8-12. As such, Child was returned to her care on October 17, 2024. *Id.* at 12. After monitoring the transition and ensuring Mother was maintaining her sobriety and mental health, Ms. Schrecengost indicated

Child's dependency was terminated on January 10, 2025. *Id.* at 13. She reported, however, that only four days later, on January 14, 2025, Child was once again removed from Mother's care and placed into shelter care. *Id.* at 13-14. She recounted:

> The police had received a phone call in the middle of the night that [Child] was … running around the neighborhood unsupervised, and he had shown up to a neighbor's home and told the neighbors that his mother had died and that he needed help. [Child] didn't have any coat on, didn't have shoes on, didn't have socks on, and it was thirteen degrees outside. The police were able to track … [C]hild's footsteps in the snow, which led to [Mother's] apartment, and the door was wide open.

*Id.* at 14; *see also id.* at 23 (Ms. Schrecengost's noting Child witnessed Mother's having a seizure and opining that is why he thought she died). The police found both Mother and Father present at Mother's residence; they both tested positive for illegal substances. *Id.* at 14. Because Mother had been on bail at the time for prior criminal charges, Ms. Schrecengost explained Mother's bail was revoked and she was incarcerated in the Clarion County Jail. *Id.* at 15; *see also id.* at 33 (stating Mother was incarcerated a little less than a month and returned to rehab on February 6, 2025).

Child was adjudicated dependent for a second time on January 24, 2025, and was returned to his previous foster home. *Id.* at 15. Ms. Schrecengost remained the family's caseworker until early June 2025. *Id.* at 16. She explained reunification goals were again put in place for both Mother and Father, which included maintaining a sober lifestyle and stabilizing their mental health. *Id.* at 16-17. Yet she reported Father did not engage in any

type of drug and alcohol treatment or mental health treatment. *Id.* at 17-18. Instead, Father told Ms. Schrecengost, "[Mother] was doing well, so he was relying on her to get [Child] back." *Id.* at 17.

Ms. Schrecengost further testified that aside from attending visitation, Father "did not make efforts towards his [reunification] goals" during Child's second dependency adjudication. *Id.* at 19. She added, "[I]t was difficult for me to get in contact with [Father] via phone call. He typically would not answer messages that I left for him…." *Id.* As for Father's visits with Child, she said Father attended "most" visitations and described the one visit she had observed as "positive[.]" *Id.* at 28; *id.* at 34 (clarifying Father missed a few visits while Mother was in rehab; stating "he did not attend any [visits] while [Mother] was away").

*Amanda Gregory*

CYS Caseworker Supervisor Amanda Gregory was assigned to this case in June 2025, following Caseworker Schrecengost's involvement with the family. *Id.* at 35. Ms. Gregory testified Father did not attend any visits for a period of seven weeks during the months of January through March 2025, while Mother was incarcerated and in rehab. *Id.* at 44. From March 2025 through October 2025, Father attended fourteen visits and cancelled or "no-showed" three visits. *Id.* at 44. When asked to describe the visits between Father and Child, Ms. Gregory replied:

> They go okay. He takes frequent smoke breaks. More recently, he's been very emotional during the visitation about this hearing and will make inappropriate statements to [Child] like [Child]

won't have to worry about seeing [Father] any time soon. There was one incident where … [Child's] birthday was the next day and [Father] did not acknowledge it or bring anything for him for his birthday until at the end of the visit, Justice Works told [Father] that [Child's] birthday was the next day and then [Father] acknowledged it.

*Id.* at 44-45.

Ms. Gregory relayed that following Mother's brief incarceration in January 2025, she was incarcerated for another probation violation from July 1 to July 21, 2025, and subsequently entered an inpatient rehabilitation program from July 21 to September 4, 2025. *Id.* at 36. After visits resumed with Mother in September of 2025, Ms. Gregory said the foster family reported a change in Child's behavior. *Id.* at 37; *see also id.* ("They've indicated that his behaviors have increased significantly in the home."). She explained:

[Child has] had increased generalized aggression, like[] hitting himself. He also makes statements like[] he's a bad boy, … nobody loves him, just very low self-esteem. Sometimes he'll have a meltdown, and it will take him hours to deescalate from it. Like, he just stays at an elevated level for extended periods of time that is not typical for his age.

*Id.* at 38; *see also id.* at 46 (adding "it's hard to pinpoint what triggers him sometimes, but he'll get triggered and just kind of have a meltdown … and it will just last for hours without the ability for him to calm down or be co-regulated with an adult"). She explained Child is in play therapy to help him process the experiences he went through and to learn to deescalate some of his behaviors. *Id.* at 38. CYS also made a referral to the Child and Adolescent Service System Program ("CASSP") to determine whether there are any additional services available for Child. *Id.*

CYS decided to pursue termination of Mother and Father's parental rights and filed its petitions on September 5, 2025. *Id.* at 39. Ms. Gregory noted that as of the date of the termination hearing, Child had been in foster care for 18 of the past 22 months. *Id.*; *see also id.* at 41 (adding Child had been in Maternal Aunt's care for one year prior to his initial removal). She testified that prior to Mother's most recent incarceration in July 2025, Father had not made any attempt to work on his reunification goals. *Id.* at 41; *see also id.* (noting Father's goals included "drug and alcohol treatment, mental health evaluation, stable housing, … income, and parenting"). She recalled, "He repeatedly made statements that he was counting on [Mother] to get [Child] back." *Id.* However, after Mother's relapse and arrest in July 2025, she acknowledged Father finally expressed a willingness to work towards reunification. *Id.*

Specifically, Ms. Gregory acknowledged Father's recommencing drug and alcohol treatment at CenClear on August 4, 2025. *Id.*; *see also id.* at 42 (emphasizing Father had not participated in any drug and alcohol treatment from May 2024 to August 2025). She also noted he began a parenting program in August 2025. *Id.* at 43; *see also id.* (opining CYS had been asking Father to engage in a parenting program since Child first became dependent in February 2024, yet he failed to do so until he was made aware of CYS's intentions to seek termination of his parental rights). Ms. Gregory further observed it was not until **after** the filing of the termination petition that Father began engaging in mental health treatment. *Id.*; *see also id.*

(stating Father "signed a release on October 6[, 2025] for Clarion Family Therapy, and as of October 27[, 2025], he had attended four weekly sessions"). Additionally, Ms. Gregory pointed out Father has not maintained stable housing during the entire two years CYS has been involved with the family. *Id.*; *see also id.* (noting Father only "just recently obtained an apartment").

Based on the foregoing, Ms. Gregory expressed concerns with Father's "ability to maintain and sustain long-term stability" for Child. *Id.* at 45, 49. She stated, "[D]uring the past two years[, Father] has not made any effort or progress on his reunification goals and has just done so beginning in August of this year after finding out about the [a]gency's intention to file for [termination of his parental rights]." *Id.* at 45. Due to Father's inconsistency and inability to maintain stability with his reunification goals, Ms. Gregory recommended terminating his parental rights to Child. *Id.* at 49. She opined termination would be in Child's best interest, as Child deserves a chance to have stability, to live in a home without substance abuse, and to receive interventions for his behavioral problems. *Id.* at 50-51; *see also id.* at 47 (noting Child's current foster parents are not a permanency resource for him, but indicating that CYS has located a potential pre-adoptive family).

*Dakota Curran*

CYS Caseworker Dakota Curran was assigned to this case in September 2025. *Id.* at 58. Mr. Curran testified he has been to Father's residence and found it to be "appropriate" housing for Child. *Id.* at 59. He clarified that

Father did not obtain his current housing until after the filing of CYS's termination petition, recollecting that he moved in "towards the end of September, beginning of October[.]" *Id.* at 58-59. Mr. Curran also relayed, "[Father] said … he works for a flooring company in DuBois[,]" but did not provide any verification of his income at that time. *Id.* at 59.

Mr. Curran testified his first interaction with Father was when he served Father with notice of the termination hearing. *Id.* at 61. He recalled Father became "very emotional" and said he hoped it was not too late for him to get Child back. *Id.* According to Mr. Curran, Father has been cooperative with CYS since he has been assigned to the case. *Id.*

*Father*

Father confirmed he has resided at his current address for "a little over a month now." *Id.* at 100. Before that, he had been renting a house in Shippenville from his boss's daughter, and prior to that — in January 2024, when CYS first became involved with this case — he lived "next to Sheetz in Clarion." *Id.* at 101, 113. Father acknowledged Child's dependency adjudication on February 1, 2024, and testified he was aware Child was living with Maternal Aunt prior to CYS's involvement. *Id.* at 100-01. Father said he was "in constant communication" with Maternal Aunt at the time, and he would pick Child up on the weekends. *Id.* at 101.

Regarding his reunification goals, Father stated he successfully completed rehab in May 2024, and then began attending drug and alcohol treatment at CenClear, but "stopped going." *Id.* at 101-02; *see also id.* at

- 10 -

118 (Father's admitting his methamphetamine usage was a "problem" and he "needed help with it"). He explained, "I was working a lot and it's something that I put off, and I do regret putting that off. I didn't feel like I needed it." *Id.* at 102. "I was just overconfident in myself." *Id.* at 119. Father testified, however, that he reengaged with CenClear in August 2025 and remains an active client to date. *Id.*; *see also id.* at 103 (Father's stating he visits with his counselor at CenClear for one hour once a week). Father also indicated he began attending weekly, one-hour sessions at Clarion Family Therapy "about a month and a half" ago and completed the Nurturing Parenting Program on November 8, 2025. *Id.* at 103-04.

As for visitation, Father conveyed he looks forward to his visits with Child and claimed he lets "nothing come in between" them. *Id.* at 109. He said if he misses a visit, he is "very sad" because he only sees Child twice a month. *Id.* Father testified Child calls him "Dad" and gives him hugs and kisses. *Id.* at 108-09. He did not recall missing seven weeks of visits while Mother was in rehab. *Id.* at 105. To the contrary, he claimed he always made his visits and even wondered "why [CYS] wouldn't up [his] visits when [he] was doing everything that they wanted [him] to do." *Id.* at 105-06. He denied taking frequent smoke breaks during visits, insisting he only took one smoke break per hour. *Id.* at 106. He stated, "I would hurry up and get back in there not wanting to miss any time with [Child]." *Id.* at 106-07; *see also id.* at 107 (Father's admitting his smoking is a "bad habit" and claiming he is trying to quit). Regarding Child's birthday, Father explained he didn't bring

Child a gift on that particular day because, as a Jehovah's Witness, he does not celebrate birthdays. *Id.* at 107, 112. But Father noted he does "celebrate life" and always buys Child gifts. *Id.* at 107. For example, he said Child "really likes cars, so I would bring him remote control cars, flying helicopters, just things that I think he would like that would up his spirit." *Id.* at 108.

Father denied CYS's claims that they had difficulty getting in touch with him. *Id.* at 106. He stated he has "the same phone number" and explained he was staying with his girlfriend, but he "always kept [his] home place on the side." *Id.* He said, "[T]hey have ways of getting in touch with me…." *Id.* Father testified he feels like CYS is trying to "demonize" him and that "they're really against [him] for no reason…." *Id.* at 107. He added, "It's like they're not trying to help me on my side. I really don't believe it, and it hurts because I feel like what can I do, how can I win when I feel like they're against me?" *Id.* at 109.

In response to questions regarding his alleged comments that he "just wanted [Mother] to get [Child] back" and why he made little effort toward his reunification goals, Father clarified:

> I said I am proud of [Mother], and I would like [Mother] to get [Child]. That would make me so happy if she got [him], but I've never said that I didn't want [Child] and that [he's] better off with her…. It's like, no—okay, if [Mother] is in the right place to do it, which I'm proud of all the progress she made, then that's fine, but if she's not, then why am I not being take[n] a look [at], looking at me and my situation and my life and stuff….

\*\*\*

Like I said, I was going to [treatment] and stuff, and I let work get in the way and I regret it, to my soul I regret not putting things where they were supposed to be. You know, and I'm looking at [Mother], looking at her do such a good job and I'm seeing on the side … how they're treating me, saying, oh, they can't get in touch with me and stuff[,] and they're giving her all the attention and stuff which, you know, I didn't fight against it because I loved that [Child was] going to come home no matter what, but I just would have liked for myself to get a little attention and talk to me, see where I'm at with things, come test me[.] … I want to show that I'm clean and that I'm sober and that I'm doing this for my [Child].

*Id.* at 110-11.

Additionally, Father claimed he has "changed [his] life" and that he receives a lot of support from his family and his girlfriend. *Id.* at 112. He said he "can't remember the last time he used [illegal drugs] or drank." *Id.* at 111. Father indicated he has stable employment, working in DuBois as a sub-contractor for B&B Flooring. *Id.* at 112; *see also id.* at 112-13 (noting he works Monday through Friday from 8:00 a.m. to 5:00 p.m.); *id.* at 113 (stating he has done this type of work for 17 years and has been with his current employer for about 4 years). He acknowledged his driver's license has been suspended, but stated, "I have a relationship with the taxi company because of it, and I never have a problem getting back and forth. … [S]o it wouldn't be a problem getting [Child] to day care or appointments…." *Id.* at 115.

When asked about CYS's seeking to terminate his parental rights, Father stated:

That just breaks my heart because I know I put this off, and I regret it so bad. I really didn't know the seriousness of this. I've never been through nothing like this, and I just was for sure that

… they were going to give [Mother Child] back, and I never—like, I really messed up by letting this time pass like this, and I wish I could take it back, and me not doing this faster really makes it look like to everyone that, like, I don't care, I'm that type of father, when I'm really not.  I would do anything for [Child].

*Id.*  Father said he thinks terminating his parental rights would "devastate" Child.  *Id.* at 116.

Following the parties' presentation of witness testimony, both Child's legal counsel and the GAL advocated for the termination of Father's parental rights.  *See id.* at 127-28.  Child's counsel argued Child has spent significant amounts of time away from both of his parents and needs stability and permanency.  *Id.*  He expressed, "[T]ermination of parental rights would be [the] first step and then moving forward to adoption."  *Id.* at 128.  Child's counsel also referenced the testimony regarding Child's behaviors escalating since parental visitation resumed in 2025, stating "he's obviously reacting to the traumas that have been associated [with his parents], and I believe that he would … do well to just move on with his life."  *Id.* at 127.

Similarly, the GAL agreed with CYS's recommendation to terminate Father's parental rights.  *Id.* at 128.  He conveyed that Child has not been "real communicative[,]" but stated that "he likes where he is and would like to stay there."  *Id.*  "[T]hrough shaking his head," Child also indicated he would like to continue visits if he could.  *Id.*  Notwithstanding, the GAL opined:

[Child] has had instability for his entire life it appears.  He has bounced around his entire life, and he's been in foster care for eighteen and a half out of twenty-two months at this point….  [S]o I think it would be in his best interest to continue in search of a family [with whom] he would have [a] lifetime of permanency….

*Id.*

At the close of the hearing, the orphans' court issued its ruling from the bench, involuntarily terminating Father's parental rights to Child pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), and (b). ***See id.*** at 139-41; ***see also*** Order, 11/12/25 (single page). On December 12, 2025, Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i). In response, the orphans' court filed a Rule 1925(a) opinion incorporating the reasons it stated at the conclusion of the November 10, 2025 hearing for its ruling on the termination petition. Orphans' Court Opinion ("OCO"), 1/7/26, at 1.

## Issues

On appeal, Father presents the following issues for our review:

1. Whether the [orphans' c]ourt erred in terminating Father's parental rights under 23 Pa.C.S.[] §[]2511(a)(1)?

2. Whether the [orphans' c]ourt erred in terminating Father's parental rights under 23 Pa.C.S.[] §[]2511(a)(2)?

3. Whether the [orphans' c]ourt erred in terminating Father's parental rights under 23 Pa.C.S.[] §[]2511(a)(5)?

4. Whether the [orphans' c]ourt erred in terminating Father's parental rights … without addressing 23 Pa.[C.S.] §[]2511(b)?

Father's Brief at 2-3.

## Analysis

Our standard of review is well-established:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported

- 15 -

by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, 9 A.3d [1179,] 1190[ (Pa. 2010)].

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re Q.R.D.***, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Section 2511 of the Adoption Act governs the termination of parental rights and requires a bifurcated analysis. ***See In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id.*** (cleaned up). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order

terminating parental rights. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super.

2004) (*en banc*).

We consider the involuntary termination of Father's parental rights

under Sections 2511(a)(1) and (b), which provide:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> \*\*\*
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

*Section 2511(a)(1)*

We begin by addressing whether the orphans' court abused its discretion

by terminating Father's parental rights pursuant to Section 2511(a)(1).

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which

reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (citation omitted). Although orphans' courts should consider the whole history of the case in assessing evidence under Section 2511(a)(1) and not mechanically apply the six-month statutory provision, *see In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009), our Supreme Court has reinforced "the six-month period immediately preceding the filing of the petition is the **most** critical period to evaluate for affirmative conduct or its absence…," *In re Adoption of C.M.*, 255 A.3d 343, 367 (Pa. 2021) (emphasis in original). "The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination." *I.J.*, 972 A.2d at 10 (citation omitted).

Regarding parental duties, our Supreme Court has explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

***C.M.S.***, 832 A.2d at 462 (quoting ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977)) (cleaned up). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." ***In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." ***Id.*** (citation omitted).

Instantly, Father claims the orphans' court erred in terminating his parental rights under Section 2511(a)(1), as "[t]he testimony and evidence presented at the hearing does not support a finding, by clear and convincing evidence, that Father has failed or refused to perform parental duties." Father's Brief at 5. He argues, rather, the record reflects "Father consistently attended visitation with his child, met his needs during those visits, and … no safety concerns were identified." ***Id.*** at 6. In support, Father avers at the time CYS filed its petition, he "was cooperating with the agency and actively working on completion of his family service plan[] goals." ***Id.***; ***see also id.*** (averring Father was complying with all the requirements imposed by CYS). Further, Father contends he "performed all parental duties available to him under the circumstances, recognizing … [C]hild's placement in foster care limited the scope of duties he was permitted to perform." ***Id.*** Father fails to convince us any relief is due on this claim.

The orphans' court found CYS met its burden in proving the termination of Father's parental rights was warranted under Section 2511(a)(1). In support of its decision, the orphans' court opined:

> [F]or a period of at least six months prior to the filing of the Petition in September[ 2025], [Father] refused or failed to perform parental duties. All he's done is [he] had some visitation arranged by CYS but has not met any of the other goals[,] particularly with regard to drug and alcohol and mental health, and his position that he didn't understand and nobody communicated with him from CYS, I find to not be credible. I think he did understand what was at stake and, by his own words, decided he didn't need drug and alcohol treatment. His work was important, understandably, but it took precedence over any efforts to regain or to gain custody of [Child,] and he was satisfied that [Mother] was making enough progress…[.] I think his perception was if she got custody, then he wouldn't need to make any effort himself, but I don't think that was based on any misunderstanding of what was at stake for him[.] … [Father] … just really chose not to do what he needed to do with his goals within the time he needed to do that, and the efforts have only recently been after knowledge of termination and can't be taken into account to his credit.

N.T. at 139-41; *see also* OCO at 1 (explaining the orphans' court based its decision "primarily on the testimony of representatives of [CYS], and especially on the testimony of Amanda Gregory, [the] ongoing supervisor at [CYS]"). Upon review, we deem the orphans' court's factual findings to be supported by competent evidence of record, and we will not disturb its findings as to credibility. *See Q.R.D.*, *supra*; *T.S.M.*, *supra*.

While recognizing the six-month period immediately preceding the filing of the termination petition is the most significant in considering termination under Section 2511(a)(1), the record establishes Father failed to perform

parental duties throughout the entirety of this case. Aside from visitation, Ms. Schrecengost and Ms. Gregory both testified Father made little to no effort towards his reunification goals until August 2025. During Child's first dependency, Father completed inpatient drug and alcohol treatment, but failed to continue with outpatient treatment and was ultimately discharged from the program. *See* N.T. at 9-10. Moreover, he never engaged in mental health treatment or completed a parenting program. *See id.* at 11-12. It was only due to Mother's progress that Child was returned to her care and dependency was terminated. *See id.* at 12. Since Child's second dependency adjudication, Father failed to attend visitation for a period of seven weeks, either cancelled or "no-showed" three other visits, and failed to engage in any further drug and alcohol treatment until August 2025. *See id.* at 41-44. He also neglected to participate in any parenting programming until August 2025. *See id.* at 43. Father did not engage in mental health treatment or obtain his current housing until after the filing of the Petition. *See id.*

The fact that Father finally started working towards his reunification goals after learning of CYS's intention to seek termination of his parental rights, and continued to make progress towards those goals after the filing of the Petition, is of no moment. With respect to a petition filed pursuant to Section 2511(a)(1), the Court is expressly prohibited from considering "any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b). As CYS argues:

- 21 -

> [I]t was not until [CYS] made Father aware of its intentions to proceed to termination of his parental rights that he began attempting to meet his goals. Father finally scheduled an intake and alcohol treatment on August 4, 2025[,] and attended four appointments prior to the filing of the termination petition[ on September 5, 2025]. Father did not commence mental health treatment until October of 2025, **after** the filing of the termination petition. He also did not obtain stable housing of his own until October of 2025, **after** the filing of the termination petition.

CYS's Brief at 5-6 (citations to record omitted; emphasis added).[5] Moreover, the orphans' court did not believe Father's testimony that he did not understand the seriousness of the situation — namely, Child's dependency adjudication and placement in foster care. *See Q.R.D.*, 214 A.3d at 239 ("[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence.") (citation omitted); *see also R.J.T.*, 9 A.3d at 1190 (emphasizing appellate courts give deference to the trial court's credibility determinations).

To the extent Father argues the scope of his parental duties was limited due to Child's placement in foster care, this excuse has no merit. "[W]here a child is in foster care, a parent has the affirmative duty to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for h[im] to be capable of performing h[is] parental duties

---

[5] Child's GAL joined in CYS's appellate brief. Child's legal counsel also advocates for the termination of Father's parental rights under Section 2511(a)(1) on appeal, reiterating CYS's argument that aside from attending visitation, Father did little to work towards his reunification goals until after CYS informed him of its intention to file a termination petition. *See* Child's Counsel's Brief at 3-9.

and responsibilities." ***Interest of A.M.***, 256 A.3d 1263, 1270-71 (Pa. Super. 2021) (citation omitted). We have already established Father failed to adequately engage with the rehabilitative services recommended to him by CYS in order to meet his reunification goals throughout the life of this case. As such, we discern no error of law or abuse of discretion in the orphans' court's decision to terminate Father's parental rights pursuant to Section 2511(a)(1).

*Section 2511(b)*

As we have determined the evidence supported the involuntary termination of Father's parental rights under Section 2511(a)(1), we next consider Section 2511(b). With respect to Section 2511(b), our Supreme Court has explained:

> [C]ourts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.

> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

Here, the orphans' court found Father lacked "a parent-child relationship" with Child and, thus, Child would not be adversely affected by the termination of Father's parental rights. N.T. at 141; *see also id.* (finding termination is in the best interest of Child). Contrarily, Father argues the orphans' court erred in finding termination is in Child's best interest. Father's Brief at 11. He believes Child would be devastated if his parental rights were terminated, arguing Child "glows" when he sees Father, has a smile on his face, and refers to Father as "Dad." *Id.* Father also notes Child's current foster family is not willing to adopt him due to his behaviors and, at the time of the termination hearing, a pre-adoptive family had not yet been identified for Child. *Id.*

In response, CYS argues termination is in the best interest of Child, despite not yet having identified a pre-adoptive home for him. CYS's Brief at 14. CYS points out that prior to his initial removal and adjudication, Child had been living with Maternal Aunt for approximately one year — **not** with either of his biological parents. *Id.* In fact, throughout the five years of his life, Father never had custody of Child. *Id.* at 14-15. While Father attended visitation, CYS avers Father would take frequent smoke breaks rather than focusing on Child and would make inappropriate comments to Child regarding the status of the dependency case. *Id.* at 15. Further, CYS argues Child's "behaviors following visits with his parents became increasingly worse and those behaviors impacted his permanency options." *Id.*

Child's counsel agrees with CYS that termination of Father's parental rights is in Child's best interest, arguing Child has a right to "stability and permanency in a home environment" and concluding termination "would minimize the length of time Child must spend in foster care." Child's Counsel's Brief at 19. Counsel emphasizes "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* at 18 (quoting *In the Interest of R.J.T.*, 990 A.2d 777, 788 (Pa. Super. 2010), *reversed on other grounds*, 9 A.3d 1179 (Pa. 2010) (citation omitted)).

As there is competent evidence in the record supporting the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, we conclude the court did not abuse its discretion in terminating Father's parental rights under Section 2511(b).

Accordingly, we affirm the orphans' court's November 12, 2025 order involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/29/2026